FILED IN UNITED STATES DISTRICT COURT, DISTRICT OF UTAH

JUN 15 2007

BY D. MARK JONES, CLERK
DEPUTY CLERK

BRETT L. TOLMAN, United States Attorney
JENNIFER SHASKY CALVERY, Trial Attorney, U.S. Department of Justice, Organized Crime & Racketeering Section
GREGORY C.J. LISA, Trial Attorney, U.S. Department of Justice, Organized Crime & Racketeering Section
Attorneys for the United States of America
1301 New York Avenue, N.W., Suite 700
Washington, D.C. 20005
Telephone: (202) 514-3894
Facsimile: (202) 514-3601

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | MAGIS NO. 2:07 MJ 227 DN<br>SEALED |
| vs. | COMPLAINT |
| EGOR MICHAILOVICH CHERNOV, a/k/a Vasko Svetlinov Aleksandrov, | VIOLATIONS:<br>18 U.S.C. §§ 1028(f) (Conspiracy to Produce and Transfer False Identification Documents); 371 (Conspiracy to Make, Furnish and Possess False Passports) |
| Defendant. | |

Before the Honorable David O. Nuffer, United States Magistrate Judge for the District of Utah, appeared the undersigned, who on oath deposes and says:

**COUNT I**

**INTRODUCTION**

1. At all times relevant to this indictment, EGOR MICHAILOVICH CHERNOV, a/k/a Vasko Svetlinov Aleksandrov (and hereinafter "CHERNOV"), was a citizen of the Russian Federation and a permanent legal resident of the United States, residing in Lehi, Utah.

2. At all times relevant to this indictment Co-Conspirator One ("CC-1") and his wife were citizens of the United States, residing in Ontario, New York. CC-1 was at one time a motivational speaker who became business partners with CHERNOV, and had business dealings with several other co-conspirators.

3. At all times relevant to this indictment, Co-Conspirator Two ("CC-2") was a citizen of Russia, residing in Russia. CC-2 was the sister of CHERNOV, and engaged in proposed real estate transactions with several other co-conspirators.

4. At all times relevant to this indictment, Co-Conspirator Three ("CC-3") was a citizen of Russia, residing in Russia, and the husband of CC-2.

5. At all times relevant to this indictment, Co-Conspirator Four ("CC-4") was a citizen of Australia, residing at certain times in Thailand. CC-4 engaged in various business transactions with CHERNOV, CC-7, and several other co-conspirators.

6. At all times relevant to this indictment, Co-Conspirator Five ("CC-5") was a citizen of Australia and a colleague of CC-4.

7. At all times relevant to this indictment, Co-Conspirator Six ("CC-6") was a citizen of the United States, residing at certain times in Draper, Utah. CC-6 was a family

friend of CHERNOV and CC-2 and at certain times was a business partner with CHERNOV. CC-6 engaged in several business transactions with CHERNOV, CC-7, and other co-conspirators.

8. At all times relevant to this indictment, Co-Conspirator Seven ("CC-7") was a citizen of the United States, residing in Davie, Florida.

## THE CONSPIRACY

9. From in or about the Fall of 2000, and continuing up to in or about September 2006, in the District of Utah and elsewhere,

**EGOR MICHAILOVICH CHERNOV,**
a/k/a Vasko Svetlinov Aleksandrov,

the defendant herein, did knowingly and willfully conspire, combine, confederate and agree with other persons both known and unknown to:

a. knowingly and without lawful authority produce false identification documents, such production having been in and affecting interstate and foreign commerce, in violation of Title 18, United States Code, Section 1028(a)(1);

b. knowingly transfer false identification documents, such transfer having been in and affecting interstate and foreign commerce, knowing that such documents were produced without lawful authority, in violation of Title 18, United States Code, Section 1028(a)(2); and

c. produce and transfer more than five false identification documents, in violation of Title 18, United States Code, Section 1028(b)(1)(B).

## MANNER AND MEANS OF THE CONSPIRACY

10. It was a part of the conspiracy that:

a. CHERNOV, along with his co-conspirators, would produce false identification documents, including false passports, driving licenses, and other means of identification.

b. CHERNOV would possess and use false identification documents in furtherance of business arrangements and financial transactions, including the creation of financial accounts and participation in real estate transactions.

c. CHERNOV would obtain credit cards for themselves and for one another, including their co-conspirators, in the false names listed on their false identity documents.

d. CHERNOV and his co-conspirators would posses, provide, and prepare false identification documents in order to avoid law enforcement and/or escape prosecution, if necessary.

e. CHERNOV and his co-conspirators would carry the false identification documents of other co-conspirators to avoid the confiscation of the false identification documents by law enforcement, and then would later meet to exchange such false identification documents in order to return them to their "true" owners.

f. CHERNOV and his co-conspirators would communicate by electronic mail and other forms of communication to transmit personal images and other identifying information for the creation of false identification documents.

g. In order to avoid later detection or discovery by law enforcement, CHERNOV and CC-7 would agree and conspire to destroy or dispose of another co-conspirator's false identification documents.

h. CHERNOV and his co-conspirators would travel in interstate and foreign commerce to meet with each other and with third parties and to further the goals of their conspiracy.

i. CHERNOV and his co-conspirators would tout CHERNOV's ability to use purported high-level foreign government contacts to obtain false passports and identification documents, including foreign diplomatic passports. The co-conspirators would offer false identification documents in order to recruit others into the conspiracy and to further the conspiracy's unlawful ends.

j. CHERNOV would provide CC-1 with false foreign passports for CC-1 and his wife, so that CC-1 would be able to escape the United States if he were subject to prosecution and/or conviction. These false passports were as follows:

i. an instrument purporting to be a Russian passport, issued in the name of CC-1, bearing CC-1's photograph, and bearing CC-1's signature;

ii. an instrument purporting to be a Russian passport, issued in the name of CC-1's wife, bearing the photograph of CC-1's wife, and bearing the forged signature of CC-1's wife; and

iii. an instrument purporting to be a Belarusian passport in the name of "Mikalai Slinko," and bearing the photograph of CC-1. (Hereinafter these documents are collectively referred to as "CC-1's Fake Passports").

k. CHERNOV later would provide CC-7 with items (i) and (ii) and a photocopy of item (iii) above so that CC-7 would destroy or otherwise dispose of them.

l. CHERNOV and other Co-Conspirators would represent that CC-7's name was "Michael Woods," a high-powered stock broker from Singapore who was a representative from DBS Vickers Securities.

i. CHERNOV and other Co-Conspirators would arrange to have CC-7 obtain a false identification document in the name of "Michael Joseph Wood," to wit, a false international driver's license, and business cards in the name of "Michael Woods."

ii. CHERNOV and other Co-Conspirators would have CC-7 pose as "Michael Woods," the purported owner of a villa they were attempting to sell and a purported stock broker in Singapore who solicited investments.

m. CHERNOV would obtain false identification documents, to wit, Bulgarian passports, Bulgarian identity cards, and Bulgarian driving licenses, for himself and CC-3, CC-4, CC-5, CC-7. Thereafter, CHERNOV would transfer and furnish these false identification documents to CC-3, CC-4, CC-5, CC-7.

n. CHERNOV and CC-7 would travel from Thailand to the United States, each traveling with the false Bulgarian identification documents of the other in order to avoid detection and/or confiscation of the documents during border crossings.

i. CHERNOV would carry a false Bulgarian passport, a false Bulgarian identification card, and a false Bulgarian driving license, each of which contained a photograph of defendant CC-7 and the falsely assumed name of "Aleksandar Stanislavov Karanikolov" (and which documents are hereinafter referred to collectively as "CC-7's Fake Bulgarian Identification Documents");

ii. CC-7 would carry a false Bulgarian passport, a false Bulgarian identification card, and a false Bulgarian driver's license, each of which contained a photograph of defendant CHERNOV and the falsely assumed name of "Vasko Svetlinov Aleksandrov" (and which documents are hereinafter referred to collectively as "Chernov's Fake Bulgarian Identification Documents");

iii. CHERNOV and CC-7 would subsequently meet in the District of Utah and exchanged the false Bulgarian documents, so that each had the set of documents containing his photograph.

**OVERT ACTS**

11. In furtherance of the conspiracy, and to effect the objects thereof, in the District of Utah and elsewhere, the defendants and co-conspirators committed the following overt acts, among others:

a. In or about the Fall of 2000, CHERNOV and CC-6 met with a third party, CW-2, and offered to obtain false passports for him. During this meeting, CC-6 advised CW-2 that he had already obtained a false Russian passport from CHERNOV, and

CHERNOV stated that he was able to acquire diplomatic Russian and diplomatic Bulgarian passports.

b. In or about July 2005, in Thailand, CHERNOV possessed a false identification document, to wit, a false identification document in the name of "Michael Joseph Wood," and held it for CC-7 in CHERNOV's safe.

c. On or about July 29, 2005, in the District of Utah, CC-1 sent an email to his wife in New York, requesting that she scan and send by email a copy of CC-1's birth certificate.

d. On or about August 15, 2005, CC-1 sent a copy of his wife's birth certificate via email to CHERNOV.

e. On or about August 16, 2005, CC-1 sent an email to his wife requesting a scanned color copy of her passport photograph, and subsequently received a copy of the passport photograph by email.

f. Between in or about September 3, 2005 to in or about September 8, 2005, CC-1 possessed a purported business letter, dated August 15, 2002, addressed to "Mr. Nikolay Slinko" at 7 Tverskaya St., 3rd Floor, Moscow Russia. The purported business letter claimed that "Slinko" possessed approximately $1.29 million in various accounts and securities.

g. In or about late 2005 to early 2006, in Thailand, CHERNOV instructed CC-4 to obtain false business cards for CC-4, CC-5, and CC-7. CC-4 and CC-7 thereafter visited a business supply store and obtained the false business cards.

h. On or about October 8, 2005, in the District of Utah and elsewhere, CHERNOV possessed and transported from Salt Lake City, Utah, to Chicago, Illinois, a series of documents that CHERNOV had assisted in producing and making, to wit, CC-1's Fake Passports, as described in Paragraph 10.j., above.

i. On or about October 9, 2005, CHERNOV transported CC-1's Fake Passports from Chicago, Illinois to CC-7 in Davie, Florida.

j. Between in or about October 20, 2005, and in or about October 22, 2005, in the Bahamas, CHERNOV and CC-6 and CC-7 met with a prospective business client, C.F. CHERNOV and CC-7 falsely represented to C.F. that CC-7 was a high-powered stock broker named "Michael Woods."

k. On or about November 15, 2005, CHERNOV applied for and activated a sub-account for CHERNOV's American Express Card, which was processed in Salt Lake City, Utah, in the name of "Aleks Karanikolov."

l. On or about November 25, 2005, CHERNOV completed and signed an application requesting that American Express issue a Platinum Delta Skymiles Business Credit Card to an individual purported to be CHERNOV's employee, "Vasko Aleksandrov." This application was thereafter mailed to American Express in Salt Lake City, Utah.

m. On or about November 29, 2005, defendant CC-7 applied for and activated a sub-account on CC-7's American Express Card in the name of "Vasko Aleksandrov."

n. In or about December 2005, defendants CHERNOV and CC-3, CC-4, CC-5, and CC-7 met in Thailand at CHERNOV's villa in Thailand and had their pictures taken by a photographer for use in false identification documents. Approximately two days later, CHERNOV provided each of the co-conspirators with a false Bulgarian passport, driving license, and identity card.

o. On or about December 15, 2005, defendant CHERNOV possessed and transported via airplane from a place outside the United States to the Salt Lake City International Airport, CC-7's Fake Bulgarian Identification Documents, as described in Paragraph 10.n., above.

p. On or about December 15, 2005, defendant CC-7 possessed and transported via airplane from a place outside the United States to the Fort Lauderdale-Hollywood International Airport, Chernov's Fake Bulgarian Identification Documents, as described in Paragraph10.n., above.

q. On or about December 27, 2005, defendant CHERNOV, in the District of Utah, possessed, transferred, and furnished CC-7's Fake Bulgarian Identification Documents to CC-7, and, in exchange, received and accepted from CC-7 Chernov's Fake Bulgarian Identification Documents.

r. On or about December 27, 2005, defendant CC-7, in the District of Utah, possessed, transferred, and furnished Chernov's Fake Bulgarian Identification Documents to CHERNOV, and, in exchange, received and accepted from CHERNOV CC-7's Fake Bulgarian Identification Documents.

s. On or about January 2006, CC-7, posing as "Michael Woods," met with C.F. in Phuket, Thailand regarding various investments, including possible stock investments on the Singapore Exchange.

t. In or about February 2006, CHERNOV, CC-7, posing as "Michael Woods," and certain other co-conspirators, planned to meet with C.F. and his wife in Moscow, Russia, regarding various investments proposed by CHERNOV. Although CC-7 did not ultimately attend the meeting, which otherwise went forward as planned, CHERNOV and others continued to refer to "Michael Woods" and the proposed business investments.

u. On or about March 9, 2006, CHERNOV sent email correspondence to C.F., related to the sale of a villa in Thailand. In subsequent correspondence, CHERNOV related that this villa belonged to "Michael Woods," an alias of CC-7.

v. From on or about March 21, 2006, through March 23, 2006, CHERNOV sent three emails to C.F. relating to the proposed visit to, and possible sale of, a villa in Thailand that CHERNOV and CC-7 had previously claimed belonged to "Michael Woods." In these emails, CHERNOV referred to CC-7 as "Michael."

w. In or about September 2006, CC-7 possessed an American Express card in the name of "Aleks Karanikolov."

All in violation of Title 18, United States Code, Section 1028(f).

**COUNT II**

12. Paragraphs 1 through 8 of Count One are incorporated by reference as if set forth fully herein.

13. From in or about the Fall of 2000, and continuing up to in or about September, 2006, in the District of Utah and elsewhere,

**EGOR MICHAILOVICH CHERNOV,**
a/k/a Vasko Svetlinov Aleksandrov,

the defendant herein, did knowingly and willfully conspire, combine, confederate and agree with other persons both known and unknown to the Grand Jury to commit offenses against the Untied State, to wit:

a. falsely make, forge, counterfeit, mutilate, and alter passports and instruments purporting to be passports, with the intent that the same may be used, in violation of Title 18, United States Code, Sections 1543;

b. willfully and knowingly furnish to another for use false and altered passports, in violation of Title 18, United States Code, Sections 1543; and

c. knowingly possess documents prescribed by statute and regulation for entry into the United States, that is, Title 8, United States Code, Section 1181, 8 C.F.R. § 212.1, knowing such documents to be altered and falsely made and otherwise procured by fraud and unlawfully obtained, in violation of Title 18, United States Code, Sections 1546.

14. Paragraphs 10 through 11 of Count One are incorporated by reference as if set forth fully herein.

All in violation of Title 18, United States Code, Section 371.

I, Gregory A. Coleman, being first duly sworn, depose and say:

15. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed for approximately eighteen (18) years. I am currently assigned to a squad responsible for investigating securities fraud, commodities fraud, and white collar money laundering at the New York Field Office. During my time as a Special Agent, I have conducted numerous investigations in which the investigative subjects have used aliases and fraudulent identity documents to further their fraudulent and/or money laundering activities. In addition, a large number of my investigations have contained an international component, that is, the investigative subjects conducted their activities both within and outside the United States.

16. I have conducted in excess of thirty criminal investigations, almost all with multiple defendants, and interviewed hundreds of witnesses, and I served as the affiant on at least ten arrest warrants.

17. As a federal agent, I am authorized to investigate violations of laws of the United States and I am a law enforcement officer with authority to execute arrest and search warrants issued under the authority of the United States.

18. I am the lead case agent involved in the ongoing criminal investigation of the individuals and entities referenced in this Affidavit. I am familiar with the contents of this Affidavit based upon personal knowledge derived from my participation in this investigation, my experience and background as a Special Agent of the FBI, and my conversations with other law enforcement agents from the FBI, the Diplomatic Security Service (DSS), and the Salt

Lake City Police Department. This Affidavit is also based upon my personal review of certain documents and records related to this investigation including the written investigative reports of other law enforcement agents, public records, and records obtained from witnesses and by grand jury subpoena.

19. Since this affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation. Where I report actions, and the contents of documents, statements and conversations with others, I report them in substance and in part.

**A. Falsified Passports for CC-1 and His Wife**

20. Federal Bureau of Investigation (FBI) Special Agent Douglas J. Soike interviewed Cooperating Witness One ("CW-1")[1] on September 1, 2006. During the interview, CW-1 stated that she is the wife of CC-1. She further stated that the last time she saw CC-1 was on September 14, 2005, when she dropped CC-1 off at the Greater Rochester International Airport for a flight to Bangkok, Thailand. CW-1understood that, among other things, CC-1 intended to meet with a business associate, Egor Chernov, during the trip. CW-1 reported she has had no contact with her husband since the day she left him at the airport and that she has reported him as missing to the New York State Police, U.S. Department of Homeland Security, and the U.S. Embassy in Bangkok, Thailand.

---

[1] CW-1 is an individual known to law enforcement whose name is being withheld to protect her privacy and safety.

21. CW-1explained that before he disappeared, CC-1 told CW-1that he and Chernov were facing tax evasion charges. CC-1 told CW-1that Chernov has an FBI contact who could help. CC-1 also told CW-1that Chernov has a way to make false passports and that they could "disappear," if necessary. On August 16, 2005, CC-1 told CW-1to scan her passport picture and birth certificate into the computer and email the documents to CC-1. CW-1followed her husband's directions.[2]

22. During my May 29, 2007 interview with Lori, she elaborated upon CC-1's tax evasion charges. She stated that in 2002 and 2003, CC-1 had been facing criminal tax charges, and that they had hired a former IRS employee, who had only made matters worse. They later retained a new attorney who instructed them to explain their situation to the government. On April 6, 2004, their attorney had received notice from the government that the criminal prosecution had been declined.

23. CW-1 explained that her conversation with CC-1 relating to their ability to "disappear" was when CC-1's tax evasion charges were still pending, possibly in 2003. She stated that CC-1 told her that if the case reached a point where they had to leave the country, they had Russian passports, as Chernov had contacts to make false Russian passports through

---

[2] During my interview of CW-1on May 29, 2007, CW-1also explained that CC-1 requested a scanned copy of her passport photograph; CW-1provided a copy of the email from CC-1, dated August 16, 2005, requesting a scanned color copy of her passport. However, CW-1stated that CC-1 had not asked her for a scanned copy of her birth certificate, but that he had access to her birth certificate; she also provided agents with a copy of an email between CC-1 and Chernov dated August 15, 2005, in which CC-1 forwards a scanned copy of CW-1's birth certificate

his sister. CW-1told CC-1 that she did not want any part of leaving the country. CC-1 told her that he was unwilling to go to jail.

24. FBI Special Agent Soike interviewed CW-1again on January23, 2007, at which time CW-1provided further information on how electronic images of her U.S. passport and birth certificate were provided to her husband and then Chernov. CW-1stated that on approximately August 16, 2005, CC-1 asked CW-1to scan her United States passport into a computer and then e-mail the image to CC-1. CW-1remembered the date because it was close to CW-1and CC-1's wedding anniversary. CW-1stated that after she scanned her passport into a computer, and e-mailed the image to her husband, she believes CC-1 forwarded the image to Chernov. A few days later (approximately August 18-20, 2005), CW-1said she observed an e-mail that CC-1 sent to Chernov. The e-mail included an image of CW-1's birth certificate.

25. After CC-1's disappearance, CW-1stated that she contacted Chernov by telephone. Chernov told her that CC-1 never appeared at their meeting and that he was missing. CW-1stated that, on October 6, 2005, she flew to Chicago, Illinois to meet Chernov. They met at the hotel at which Chernov was staying. CW-1stated that, during the meeting, Chernov showed her falsified Russian passports for both she and CC-1. CW-1stated that the passports contained accurate pictures of CW-1and CC-1 with false names. CW-1said she believed Chernov arranged the meeting in Chicago to convince her that CC-1 had disappeared on purpose.

26. During my interview of CW-1on May 29, 2007, CW-1further explained the meeting between her and Chernov in October 2005. CW-1stated that she remembered that the date of her trip to see Chernov in Chicago was actually October 8, 2005. (I have referred to subpoenaed travel records, which confirm that the latter date (October 8, 2005) is correct.) CW-1stated that Chernov had pulled out passports and showed them to CW-1, and asked if she had ever seen them before. CW-1told Chernov that she had not, but stated that she understood that Chernov had a hand in making those documents. According to CW-1, Chernov acknowledged that he had a role in creating these false passports (the ones he brought to the hotel in Chicago), but stated that CC-1 had another source for other false passports.

27. I interviewed CC-7 on September 22, 2006. CC-7 advised that he was first introduced to Egor Chernov in connection with a business deal and, thereafter, the two engaged in various business/vacation trips together. CC-7 stated that in approximately November 2005, Chernov traveled from Salt Lake City to Chicago to meet with CW-1, and then traveled from Chicago to Davie, Florida where CC-7 resides. While in Davie, CC-7 stated that Chernov gave him an envelope containing false passports and a copy of a false passport. CC-7 provided me with a copy of the items during the interview. In a subsequent interview on December 5, 2006, CC-7 provided me with the envelope containing the original items.

28. The envelope CC-7 provided to me contained an instrument purporting to be a Union of Soviet Socialist Republic (U.S.S.R.) passport issued in the name of CC-1 with the nationality specified as Russian; an instrument purporting to be a U.S.S.R. passport issued in

the name of CW-1 with the nationality specified as Russian; and a photocopy of an instrument purporting to be a Belarussian passport issued in the name of Mikalai Slinko (containing a photograph of CC-1).

29. FBI Special Agent Soike showed CW-1a color photocopy of each of the items on January 23, 2007.

a. The first photocopy that CW-1viewed was of an instrument purporting to be a Union of Soviet Socialist Republic (U.S.S.R.) passport issued in the name of CC-1 with the nationality specified as Russian. CW-1verified that CC-1's signature, date of birth, and picture, as they appear on the passport, are accurate. However, CW-1stated that prior to this interview she had never seen the "Soviet" passport. During my May 29, 2007 interview of CW-1, she recalled that she had, in fact, seen this “Soviet” passport with CC-1’s photograph and name.

b. The next photocopy viewed by CW-1 was of an instrument purporting to be a Belarussian passport issued in the name of Mikalai Slinko. CW-1stated that she did not recognize the name Mikalai Slinko, Slinko's date of birth, nor the passport signature. However, CW-1verified that the picture on the passport was of CC-1. CW-1indicated that this was the passport Chernov had showed her during their meeting in Chicago in October 2005.

c. The third passport copy viewed by CW-1was of an instrument purporting to be a U.S.S.R. passport issued in the name of CW-1 with the nationality specified as Russian. The signature on the passport reads “[name of CW-1],” however according to CW-1, it is not her handwriting. CW-1said she believed CC-1 forged her signature because

the handwriting style closely resembles that of CC-1. CW-1stated that Chernov had also showed her this passport during their meeting in Chicago in October 2005.

30. On May 29, 2007, I, along with SA Gregory Schossler, United States Department of State, Diplomatic Security Service, interviewed CW-1. During this interview, CW-1clarified that she had dropped off CC-1 at the Rochester airport on the 15th of September, and that this was a flight from Rochester to JFK International Airport in New York City, New York, from where CC-1 took his flight to Bangkok.[3]

31. On August 15, 2006, I received an email from another witness, Cooperating Witness Two ("CW-2"),[3] in which CW-2 described a conversation he had with Chernov about the falsified passports of CC-1 and CW-1. CW-2 said he met with Chernov and others in the Bahamas in October 2005. CW-2, who was previously acquainted with CC-1 and understood him to be Chernov's business partner, said that he asked Chernov why CC-1 was not present. According to CW-2, Chernov replied that CC-1 had disappeared because he had warrants for tax evasion and fraud. Chernov reportedly admitted to CW-2 that he had gotten CC-1 a new passport which CC-1 had used to vanish. Chernov told CW-2 that he planned to meet with CC-1's wife to explain it to her and get back her forged passport which he (Chernov) had gotten for her in Thailand.

---

2 In a prior affidavit, I inadvertently stated that CW-1 had informed me that she had dropped CC-1 at the airport on the 15th of September, when, in fact CW-1 said that she dropped CC-1 at the airport on the 14th. I had mistakenly confused the dates that she reported to me.

3 CW-2 is an individual known to law enforcement whose name is being withheld to protect his privacy and safety

32. I interviewed witness Egor Chernov on December 7, 2006. Chernov stated that he was raised in Russia and came to the United States for the first time in high school as part of an exchange program and then permanently after attending university in Moscow, Russia. Chernov said his sister still lives in Russia and is a judge in Moscow.

33. I did not inform Chernov about any of the information the FBI had gathered to date about the falsified passports. During the interview, Chernov raised the topic himself. Chernov said both CC-1 and CW-1had falsified passports. Chernov stated that his sister (CC-2) knew someone who worked for the Chief of Staff of the Russian President and could get falsified Belarussian passports. Chernov stated that he believed CC-1 obtained a Belarussian passport from this person. Chernov said CC-1 provided Chernov with a copy of his falsified Belarussian passport in approximately 2002 or 2003. CC-1 told Chernov that he had tax problems and wanted Chernov to set up a bank account for him offshore using the passport. Chernov stated the name in the passport was Nicholas Slinko.

34. Chernov stated that, at the time this occurred, he reported everything to the FBI. I have confirmed that Chernov did, in fact, have a discussion with an FBI agent in which Chernov admitted to having previously provided CC-1 with the Belarussian passport. However, there is no information indicating that Chernov was given authorization by the FBI to falsify this or any other passport.

35. I am also investigating an allegation that after CC-1 arrived in Bangkok, Thailand, he was murdered at the direction of Chernov, as well as the possibility that CC-7 attempted to use Chernov's participation in the murder to extort money and property from

Chernov. Although the alleged murder and extortion are not currently offered as the basis for the requested warrant, I believe the investigation of these additional violations is inextricably intertwined with the investigation of the falsified passports of CC-1 and CW-1 and relevant to assessing the credibility of the information provided by both CC-7 and Chernov.

36. CC-7 told me that he was present in Phuket, Thailand in September 2005 to hear Chernov direct CC-4 and CC-5 to kill CC-1. CC-7 said that he and Chernov flew to Singapore together to do some business and because Chernov wanted to be able to prove he was not in Thailand at the time the murder occurred. CC-7 admitted that he and Chernov returned to Thailand and helped CC-4 to destroy documents and personal items left behind by CC-1. CC-7 said CC-4 described how he and CC-5 had carried out the murder after taking CC-1 on a boat into the shipping channels off the coast of Pattaya, Thailand. CC-7 gave me a ring and cuff links that he said belonged to CC-1 and were taken by CC-7 at the time he and the others were destroying evidence of the murder in Thailand.

37. FBI Special Agent Soike showed CW-1a photograph of the ring and cuff links on January 23, 2007. SA Soike advised that upon viewing the photograph CW-1began to cry and her mental and physical state appeared to be visibly shaken. After composing herself, CW-1stated that the gold wedding band with the large diamond in the middle and the two smaller diamonds on each side was CC-1's wedding band. CW-1said that she gave the wedding band to CC-1 about four to five years ago because CC-1 lost his original wedding band. CW-1explained that the large diamond in the middle of the band was her original

engagement diamond. The four smaller diamonds were new when she created the band for CC-1. CW-1also recognized two of the four sets of cuff links as those belonging to CC-1.

38. CC-7 also provided information to me revealing that CC-7 has a personal grudge against Chernov and has threatened him. Specifically, CC-7 provided me with a copy of an email that he sent to Chernov on September 12, 2006, in which CC-7 threatens Chernov. The e-mail states:

Egor Chernov,

This will be your last opportunity to repay us. If I have not received a wire in full, within 48 Hrs, I am going to CRUSH YOU. Your life as you know it, will be over. I already have everything in place, to do so, and will initiate the beginning of the end for you, immediately.

First, you will see direct contacts, in person, made with at least 50 people that you know, and do business with. The list will include The Davids & Katamunda Staff, Lord Alex, Peter Moron & Associate, Charlie Flynn & Lisa & his boys, The Texas Gents you robbed, Scot Vanderweel you robbed, Laura Judd & Family, Adam Grimshaw, Mark Winter, The Bailey's, Mark & Chris in Vegas, Every Hotel Property & Staff like The Hyatt's, The Peninsula, The Shang-Gra-La, and many others.Your Family, on both sides, including the Dajany's. The list goes on & on. Everyone will be "PUT ON NOTICE" that they might be accomplisses [sic]. Topics will include:

1. Pre-Meditated Murder
2. Attempted Murder
3. Fraud
4. Tax Evasion
5. Theft
6. Drugging People
7. Illegal Companies
8. Illegal Transfers
9. Many other illegal acts.........

After this has been initiated, and everyone knows who you are, I am going to hunt you down. I know you are not able to defend yourself or your family. I will have you brought to me, because I want to look in your eyes. I already know what I will see.

You have 2 days to comply. I will not ask you again.

Govern Yourself Accordingly

39. In November 2006, I received information that CC-7 was in Utah "with some buddies" looking for Chernov. On November 15, 2006, Chernov's wife made a report to the local police that their house had been vandalized. Various phrases were spray painted on the house and property, including: "Egor Chernov murdered CC-1!" and "Russian Maggot!" and "Russian Thief." A knife was left sticking in the front door frame. On November 27, 2006, CC-7 contacted me via email saying: "I've been traveling quite a bit, and was actually out west for a couple of days, and left a pretty strong message for the Russian Maggot."

40. I have also discovered additional information which corroborates my belief that CC-7 had a personal grudge against Chernov and that he participated in an attempted extortion against Chernov and his family. For instance, Chernov provided law enforcement agents with another email from CC-7, dated November 22, 2006, in which CC-7 states: "The next time I stop by your house, to see you and your family, I won't be with Picasso. I will be [sic] some of my buddies that are very excited to have a CHAT with you. I promise I will teach you a LESSON, that nobody will ever forget." The email continues by demanding "If I don't hear back from you, and have my money, by 5:00 Pacific Time on November 24, 2006, I will consider you just another Little Russian Cunt, that likes to steal from his mates." The email also instructs Chernov to wire back "my cash, with interest, or start signing over properties to my company."

41. Moreover, in subsequent emails to me and to another witness, CW-2, CC-7 made several other references to himself as "Picasso," or hybrids of his nickname ("Ug" or "Ugster") with various artists, such as "Ug-Gogh," "Ugster-Brandt," and "Ug-BrandtGoghCasso," or commenting on "that Southwestern Desert Deco Artwork." In an email to CW-2 on January 3, 2007, CC-7 relates that his "artistic, creative abilities can show their ugly faces at anytime."

**B. Falsified Identification Documents for Chernov, CC-7, and Their Associates**

42. CC-7 also told me that in approximately December 2005, Chernov had a photographer come to his villa in Thailand to take pictures of Chernov, CC-7, and their associates: CC-4; CC-5; and CC-3. According to CC-7, Chernov had falsified passports made for everyone within two days. He also obtained falsified driver's licenses and identity cards.

43. CC-7 provided me with the items made for him. The items consisted of instruments purporting to be a Bulgarian passport, a Bulgarian driver's license, and a Bulgarian identity card. Each of the items had a picture of CC-7 but were in the name of Aleksandar Karanikolov.

44. CC-7 also provided me with a photocopy of the items made for Egor Chernov. The items consisted of instruments purporting to be a Bulgarian passport, a Bulgarian driver's license, and a Bulgarian identity card. Each of the items had a picture of Chernov but were in the name of Vasko Svetlinov Aleksandrov.

45. CC-7 said that when he and Chernov traveled from Thailand back to the United States after having the falsified passports and other identity instruments made, CC-7 transported Chernov's falsified instruments into the United States and Chernov transported CC-7' falsified instruments into the United States. CC-7 informed me that the purpose for this procedure was to prevent U.S. law enforcement from discovering either CC-7 or Chernov carrying both their valid and falsified identity instruments, an event which would make it clear to law enforcement that at least one of the sets of instruments were falsified. CC-7 said that he and Chernov then later met in the United States and exchanged instruments.

**C. Misuse of the Names Michael Woods and Frank Wong**

46. CW-2 also informed me that Chernov and CC-7 used aliases and assumed false identities in their relations with him. Specifically, CW-2 informed me that he hosted a birthday party for his father in the Bahamas in October 2005. CW-2 said that Chernov traveled to the Bahamas to meet CW-2's father and brought with him some other business associates, including an individual who identified himself as Michael Woods. CW-2 stated that "Woods" presented a business card showing he was a broker for DBS Vickers Securities in Singapore.[4] CW-2 met with "Woods" and Chernov on other occasions about the possibility of doing business together in the Singapore markets and purchasing a villa in Thailand, purportedly owned by Woods. It was only much later that CW-2 learned that the individual introduced to him as Michael Woods was, in fact, CC-7.

---

[4] CW-2 has emailed me a copy of the "Michael Woods" business card that he was provided by CC-7. Additionally, CC-7 provided me with a box of business cards bearing the name "Michael Woods" that he stated was created in Thailand at the direction of Chernov.

47. CC-7 told me Chernov is the one who arrived at the idea for CC-7 to call himself Michael Woods. According to CC-7, Chernov said that he was planning a big stock "score" involving CW-2 who owned $13 million worth of stock in Normexsteel. CC-7 said Chernov wanted him to pretend to be a stock broker since CC-7 knows the market. Chernov told CC-7 to use the name Michael Woods to protect himself in the event things did not work as planned. CC-7 said he first met CW-2 in the Bahamas in October 2005, while posing as Michael Woods.

48. Chernov told me that he was in Thailand with CW-2 in January 2006 to discuss a business deal, when CC-7 showed up unannounced. CC-7 asked to be picked up from the airport. Chernov stated that CC-7 told CW-2 his name was Michael Woods and that CC-7 had started calling himself Michael Woods on a previous trip to Thailand. Chernov did not mention anything about asking CC-7 to take on the alias of Michael Woods.

49. On September 8, 2006, CW-2 provided me with a copy of some email correspondence between CW-2 and Chernov in which Chernov perpetuates CC-7's misuse of the name Michael Woods. In the first email, dated March 21, 2006, CW-2 writes Chernov to find out whether CW-2 and his family can stay at the villa of "Michael" [Woods] during their upcoming trip to Thailand. In the second email, dated March 22, 2006, Chernov responds that "Michael's [Wood's] place is no problem so far."

50. In a subsequent interview, CW-2 informed me that in January 2006, he was in Phuket, Thailand with Chernov and CC-7, both of whom were still pretending that CC-7' name was "Michael Woods." Chernov and CC-7 were pushing CW-2 to purchase a villa in

the Katamanda Residential Estates in Phuket that was purportedly owned by "Woods." CW-2 also informed me that in February 2006, he visited Chernov in Moscow. Chernov continued to pressure CW-2 to purchase the villa purportedly owned by "Woods.". CW-2 later learned that neither "Woods"/ CC-7 nor Chernov had any ownership interest in the villa. CW-2 also stated that CC-6 and CC-4 were present at various times when CC-7 was pretending to be Michael Woods, and that they went along with the misidentification.

51. I have also reviewed an email from CC-7 to Chernov in which CC-7 admits having pretended to be "M. Wood." In the email, CC-7 states: "You may not realize it yet, at your age, but life is very short, and when you are lucky, or blessed, enough to find someone who is a real friend, that has been 100% honest, and there for you, in everything, like playing M.Wood for you, you should cherish & respect that."

52. CW-2 also advised me that the reason he was planning to travel and ultimately did travel to Thailand in March 2006 was to attend a meeting concerning certain investment opportunities involving Russian oil leases. CW-2 provided me with a copy of the invitation to the meeting which was in the form of a business letter purportedly written by Frank Wong, COO, DBS Group. According to the letter, the people who were invited to the meeting included: Chernov; CW-2; Wong; Koh Ban Heng, CEO of Singapore Petroleum Co., Ltd.; Anatoly Chabak, Director General of Uralsib-Nikoil; Vitaliy Kondrashov, Minister of Natural Resources of the Russian Federation; and Hsieh Fu Hua, CEO of Singapore Exchange.

53. CW-2 stated that when he traveled to Thailand in March 2006 the meeting never occurred. Instead, CW-2 states that Chernov and others attempted to forcibly take and

hold CW-2 on a boat against his will, including by assaulting him with a stun gun. After managing to escape, CW-2 says that he began investigating the purported invitation from Frank Wong. On September 8, 2006, CW-2 provided me with a copy of email correspondence between CW-2 and an employee of DBS Vickers Securities. In her email of April 25, 2006, the DBS Vickers Securities employee states:

Dear [CW-2],

Thank you for alerting us of the Russian scam where DBS Vickers' name was used.

Our group investigation department has reviewed your case and advised the following:

1. The invitation letter dated 10 Mar 2006 that was addressed to Egor Chernov and [CW-2] and purportedly undersigned by Frank Wong is not issued by DBS Vickers Securities, as represented. The documents are fabricated and Frank Wong's signature is forged.

2. The name card that you received from Michael Woods is not a valid business card of DBS Vickers Securities and there is no employee by the name of Michael Woods.

3. DBS Group has reported the matter to the law enforcement authorities.

4. You are advised to report the incident to the relevant authorities as soon as possible.

Regards

[DBS Vickers Securities employee]

54. I have not yet learned whether Chernov and CC-7 also conspired to and did have passports made in the names of Michael Woods and Frank Wong. However, I have gathered some evidence indicating that a false identification document in the name of Michael Wood [sic] was produced. Specifically, Chernov provided me with a scanned image of an

item purporting to be an international driver's license in the name of Michael Joseph Wood. It contained a photograph of CC-7.

**D. Recent Interview of Chernov**

55. On June 13, 2007, I, along with Special Agent Gregory Schossler, Diplomatic Security Service, United States Department of State, and Special Agent Anthony Fiorini, FBI, interviewed Egor Chernov in his home. During the interview, Chernov made admissions regarding the facilitation of CC-1's Russian passports in the names of CC-1 and CW-1. Specifically, he said that two to three years ago, CC-1 was asking him and CC-6 if they could get him Russian Passports. Chernov said that he contacted a Russian immigration attorney. Chernov delivered paperwork to CC-1 from the attorney. In doing so, Chernov described his (Chernov's) role as an "intermediary". CC-1 completed and signed the paperwork which was mailed to an unnamed law firm in Russia, along with pictures of CC-1 and CW-1. Chernov said that the completed passports may have been returned by CC-6, noting that they "weren't mailed." I asked Chernov directly "did [CC-6] carry the passports back from Russia?" Chernov replied that "[CC-6] brought them back." Chernov stated that the Russian passports were given to CC-1 while in a car with Chernov and CC-6. Chernov stated that CC-6 handed CC-1 the passports. Chernov did not recall where they were when he (Chernov), CC-1 and CC-6 were in the car. Chernov then claimed that he had made a "disclaimer" to CC-1, claiming that he informed CC-1 that all of these actions had to be legal. Chernov described his serving as an "intermediary" of the Russian passport as something he did for CC-1 "friend to friend."

56. During the course of the interview, Chernov admitted that he had added two "Russian names" to one of his American Express accounts at the request of CC-7. Chernov claimed that at the time, he believed CC-7 wanted to give the cards to employees of his Rubirosa Cigar business venture. Chernov claimed that CC-7 was never forthcoming about the reason for the cards. Chernov claimed that he never gave the cards to CC-7. Chernov claimed he shredded them. At a later point in the interview, Chernov was shown a copy of the referenced card application which had been obtained via subpoena. Chernov looked at the American Express application and agreed he had signed and completed it. One of the names on the application was Vasko Aleksandrov. Chernov said he recalled that name as one of the Russian names he previously told us about.

57. Chernov was then showed a copy of three documents, all of which contained his photograph but the name Vasko Svetlinov Aleksandrov: a Bulgarian passport, a Bulgarian drivers license, and a Bulgarian identity card. Chernov looked at the documents and noted "looks like me." He then said "how can we deal with this?"

DATED this 15 day of June 2007.

Gregory A. Coleman, Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME this 15 day of June 2007,

THE HONORABLE DAVID O. NUFFER
United States Magistrate Judge

APPROVED:
~~PAUL M. WARNER~~ BRETT TOLMAN
United States Attorney

JENNIFER SHASKY CALVERY
GREGORY C.J. LISA
Trial Attorneys
U.S. Department of Justice, Criminal Division