FILED
U.S. DISTRICT COURT

2007 JUN 28  A 9: 03

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

BRETT L. TOLMAN, United States Attorney
JENNIFER SHASKY CALVERY, Trial Attorney, U.S. Department of Justice,
Organized Crime & Racketeering Section
GREGORY C.J. LISA, Trial Attorney, U.S. Department of Justice,
Organized Crime & Racketeering Section
Attorneys for the United States of America
1301 New York Avenue, N.W., Suite 700
Washington, D.C.  20005
Telephone:    (202) 514-3894
Facsimile:    (202) 514-3601

# SEALED

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | :    I N D I C T M E N T |
| vs. | : |
| | :    VIOLATION: |
| EGOR MICHAILOVICH CHERNOV, | 18 U.S.C. §§ 1028(f) (Conspiracy |
| a/k/a Vasko Svetlinov Aleksandrov, | :    to Produce and Transfer False |
| | Identification Documents); 371 |
| Defendant. | :    (Conspiracy to Make, Furnish and |
| | Possess False Passports) |
| | : |

The Grand Jury charges:

Case: 2:07-cr-00423
Assigned To : Kimball, Dale A.
Assign. Date : 6/28/2007
Description: USA v.

## COUNT I

## INTRODUCTION

1.     At all times relevant to this indictment, EGOR MICHAILOVICH CHERNOV, a/k/a Vasko Svetlinov Aleksandrov (and hereinafter "CHERNOV"), was a citizen of the Russian Federation and a permanent legal resident of the United States, residing in Lehi, Utah.

2.     At all times relevant to this indictment Co-Conspirator One and his wife were citizens of the United States, residing in Ontario, New York.  Co-Conspirator One was at one time a motivational speaker who became business partners with CHERNOV, and had business dealings with several other co-conspirators.

3.     At all times relevant to this indictment, Co-Conspirator Two was a citizen of Russia, residing in Russia.  Co-Conspirator Two was the sister of CHERNOV, and engaged in proposed real estate transactions with several other co-conspirators.

4.     At all times relevant to this indictment, Co-Conspirator Three was a citizen of Russia, residing in Russia, and the husband of Co-Conspirator Two.

5.     At all times relevant to this indictment, Co-Conspirator Four was a citizen of Australia, residing at certain times in Thailand.  Co-Conspirator Four engaged in various business transactions with CHERNOV, Co-Conspirator Seven, and several other co-conspirators.

6.     At all times relevant to this indictment, Co-Conspirator Five was a citizen of Australia and a colleague of Co-Conspirator Four.

2

7.      At all times relevant to this indictment, Co-Conspirator Six was a citizen of the United States, residing at certain times in Draper, Utah.  Co-Conspirator Six was a family friend of CHERNOV and Co-Conspirator Two, and at certain times was a business partner with CHERNOV.  Co-Conspirator Six engaged in several business transactions with CHERNOV, Co-Conspirator Seven, and other co-conspirators.

8.      At all times relevant to this indictment, Co-Conspirator Seven was a citizen of the United States, residing in Davie, Florida.

### THE CONSPIRACY

9.      From in or about the Fall of 2000, and continuing up to in or about September 2006, in the District of Utah and elsewhere,

**EGOR MICHAILOVICH CHERNOV**,
a/k/a Vasko Svetlinov Aleksandrov,

the defendant herein, did knowingly and willfully conspire, combine, confederate and agree with other persons both known and unknown to the Grand Jury to:

a.      knowingly and without lawful authority produce false identification documents, such production having been in and affecting interstate and foreign commerce, in violation of Title 18, United States Code, Section 1028(a)(1);

b.      knowingly transfer false identification documents, such transfer having been in and affecting interstate and foreign commerce, knowing that such documents were produced without lawful authority, in violation of Title 18, United States Code, Section 1028(a)(2); and

3

      c.      produce and transfer more than five false identification documents, in violation of Title 18, United States Code, Section 1028(b)(1)(B).

## MANNER AND MEANS OF THE CONSPIRACY

10.     It was a part of the conspiracy that:

      a.      CHERNOV, along with his co-conspirators, would produce false identification documents, including false passports, driving licenses, and other means of identification.

      b.      CHERNOV and Co-Conspirator Seven would possess and use false identification documents in furtherance of business arrangements and financial transactions, including the creation of financial accounts and participation in real estate transactions.

      c.      CHERNOV and Co-Conspirator Seven would obtain credit cards for themselves and for one another, including their co-conspirators, in the false names listed on their false identity documents.

      d.      CHERNOV and his co-conspirators would posses, provide, and prepare false identification documents in order to avoid law enforcement and/or escape prosecution, if necessary.

      e.      CHERNOV and his co-conspirators would carry the false identification documents of other co-conspirators to avoid the confiscation of the false identification documents by law enforcement, and then would later meet to exchange such false identification documents in order to return them to their "true" owners.

f.      CHERNOV and his co-conspirators would communicate by electronic mail and other forms of communication to transmit personal images and other identifying information for the creation of false identification documents.

g.      In order to avoid later detection or discovery by law enforcement, CHERNOV and Co-Conspirator Seven would agree and conspire to destroy or dispose of another co-conspirator's false identification documents.

h.      CHERNOV and his co-conspirators would travel in interstate and foreign commerce to meet with each other and with third parties and to further the goals of their conspiracy.

i.      CHERNOV and his co-conspirators would tout CHERNOV's ability to use purported high-level foreign government contacts to obtain false passports and identification documents, including foreign diplomatic passports. The co-conspirators would offer false identification documents in order to recruit others into the conspiracy and to further the conspiracy's unlawful ends.

j.      CHERNOV would provide Co-Conspirator One with false foreign passports for Co-Conspirator One and his wife, so that Co-Conspirator One would be able to escape the United States if he were subject to prosecution and/or conviction.  These false passports were as follows:

i.      an instrument purporting to be a Russian passport, issued in the name of Co-Conspirator One, bearing Co-Conspirator One's photograph, and bearing Co-Conspirator One's signature;

ii.      an instrument purporting to be a Russian passport, issued in the name of Co-Conspirator One's wife, bearing the photograph of Co-Conspirator One's wife, and bearing the forged signature of Co-Conspirator One's wife; and

iii.      an instrument purporting to be a Belarusian passport in the name of "Mikalai Slinko," and bearing the photograph of Co-Conspirator One.  (Hereinafter these documents are collectively referred to as "Co-Conspirator One's Fake Passports").

k.      CHERNOV later would provide Co-Conspirator Seven with items (i) and (ii) and a photocopy of item (iii) above so that Co-Conspirator Seven would destroy or otherwise dispose of them.

l.      CHERNOV, Co-Conspirator Seven, and other co-conspirators would represent that Co-Conspirator Seven's name was "Michael Woods," a high-powered stock broker from Singapore who was a representative from DBS Vickers Securities.

i.      CHERNOV, Co-Conspirator Seven, and other co-conspirators would arrange to have Co-Conspirator Seven obtain a false identification document in the name of "Michael Joseph Wood," to wit, a false international driver's license, and business cards in the name of "Michael Woods."

ii.      CHERNOV, Co-Conspirator Seven, and other co-conspirators would have Co-Conspirator Seven pose as "Michael Woods," the purported owner of a villa they were attempting to sell and a purported stock broker in Singapore who solicited investments.

6

m.     CHERNOV would obtain false identification documents, to wit, Bulgarian passports, Bulgarian identity cards, and Bulgarian driving licenses, for himself, and Co-Conspirators Three, Four, Five, and Seven.  Thereafter, CHERNOV would transfer and furnish these false identification documents to Co-Conspirators Three, Four, Five, and Seven.

n.     CHERNOV and Co-Conspirator Seven would travel from Thailand to the United States, each traveling with the false Bulgarian identification documents of the other in order to avoid detection and/or confiscation of the documents during border crossings.

i.     CHERNOV would carry a false Bulgarian passport, a false Bulgarian identification card, and a false Bulgarian driving license, each of which contained a photograph of Co-Conspirator Seven and the falsely assumed name of "Aleksandar Stanislavov Karanikolov" (and which documents are hereinafter referred to collectively as "Co-Conspirator Seven's Fake Bulgarian Identification Documents");

ii.     Co-Conspirator Seven would carry a false Bulgarian passport, a false Bulgarian identification card, and a false Bulgarian driver's license, each of which contained a photograph of defendant CHERNOV and the falsely assumed name of "Vasko Svetlinov Aleksandrov" (and which documents are hereinafter referred to collectively as "Chernov's Fake Bulgarian Identification Documents");

iii.     CHERNOV and Co-Conspirator Seven would subsequently meet in the District of Utah and exchange the false Bulgarian documents, so that each had the set of documents containing his photograph.

7

## OVERT ACTS

11.    In furtherance of the conspiracy, and to effect the objects thereof, in the District of Utah and elsewhere, the defendant and his co-conspirators committed the following overt acts, among others:

a.    In or about the Fall of 2000, CHERNOV and Co-Conspirator Six met with a third party, C.F., and offered to obtain false passports for him.  During this meeting, Co-Conspirator Six advised C.F. that he had already obtained a false Russian passport from CHERNOV, and CHERNOV stated that he was able to acquire diplomatic Russian and diplomatic Bulgarian passports.

b.    In or about July 2005, in Thailand, CHERNOV possessed a false identification document, to wit, a false identification document in the name of "Michael Joseph Wood," and held it for Co-Conspirator Seven in CHERNOV's safe.

c.    On or about July 29, 2005, in the District of Utah, Co-Conspirator One sent an email to his wife in New York, requesting that she scan and send by email a copy of Co-Conspirator One's birth certificate.

d.    On or about August 15, 2005, Co-Conspirator One sent a copy of his wife's birth certificate via email to CHERNOV.

e.    On or about August 16, 2005, Co-Conspirator One sent an email to his wife requesting a scanned color copy of her passport photograph, and subsequently received a copy of the passport photograph by email.

8

f.      Between in or about September 3, 2005 to in or about September 8,

2005, Co-Conspirator One possessed a purported business letter, dated August 15, 2002,

addressed to "Mr. Nikolay Slinko" at 7 Tverskaya St., 3rd Floor, Moscow Russia.   The

purported business letter claimed that "Slinko" possessed approximately $1.29 million in

various accounts and  securities.

g.      In or about late 2005 to early 2006, in Thailand, CHERNOV instructed

Co-Conspirator Four to obtain false business cards for Co-Conspirators Four, Five and Seven.

Co-Conspirator Four and Seven thereafter visited a business supply store and obtained the

false business cards.

h.      On or about October 8, 2005, in the District of Utah and elsewhere,

CHERNOV possessed and transported from Salt Lake City, Utah, to Chicago, Illinois, a series

of documents that CHERNOV had assisted in producing and making, to wit, Co-Conspirator

One's Fake Passports, as described in Paragraph 10.j., above.

i.      On or about October 9, 2005, CHERNOV transported Co-Conspirator

One's Fake Passports from Chicago, Illinois to Co-Conspirator Seven in Davie, Florida.

j.      Between in or about October 20, 2005, and in or about October  22,

2005, in the Bahamas, Co-Conspirator Seven, CHERNOV, and Co-Conspirator Six met with

a prospective business client, C.F.  CHERNOV and Co-Conspirator Seven falsely represented

to C.F. that Co-Conspirator Seven was a high-powered stock broker named "Michael Woods."

k.      On or about November 15, 2005, CHERNOV applied for and activated a sub-account for CHERNOV's American Express Card, which was processed in Salt Lake City, Utah, in the name of "Aleks Karanikolov."

l.      On or about November 25, 2005,  CHERNOV completed and signed an application requesting that American Express issue a Platinum Delta Skymiles Business Credit Card to an individual purported to be CHERNOV's employee, "Vasko Aleksandrov." This application was thereafter mailed to American Express in Salt Lake City, Utah.

m.      On or about November 29, 2005, Co-Conspirator Seven applied for and activated a sub-account on Co-Conspirator Seven's American Express Card in the name of "Vasko Aleksandrov."

n.      In or about December 2005, defendant CHERNOV and Co-Conspirators Three, Four, Five, and Seven, met in Thailand at CHERNOV's villa and had their pictures taken by a photographer for use in false identification documents.  Approximately two days later, CHERNOV provided each of the co-conspirators with a false Bulgarian passport, driving license, and identity card.

o.      On or about December 15, 2005, defendant CHERNOV possessed and transported via airplane from a place outside the United States to the Salt Lake City International Airport, Co-Conspirator Seven's Fake Bulgarian Identification Documents, as described in Paragraph 10.n., above.

p.      On or about December 15, 2005, Co-Conspirator Seven possessed and transported via airplane from a place outside the United States to the Fort Lauderdale-

Hollywood International Airport, Chernov's Fake Bulgarian Identification Documents, as described in Paragraph 10.n., above.

        q.    On or about December 27, 2005, defendant CHERNOV, in the District of Utah, possessed, transferred, and furnished Co-Conspirator Seven's Fake Bulgarian Identification Documents to Co-Conspirator Seven, and, in exchange, received and accepted from Co-Conspirator Seven, Chernov's Fake Bulgarian Identification Documents.

        r.    On or about December 27, 2005, Co-Conspirator Seven, in the District of Utah, possessed, transferred, and furnished Chernov's Fake Bulgarian Identification Documents to CHERNOV, and, in exchange, received and accepted from CHERNOV, Co-Conspirator Seven's Fake Bulgarian Identification Documents.

        s.    On or about January 2006, Co-Conspirator Seven, posing as "Michael Woods," met with C.F. in Phuket, Thailand regarding various investments, including possible stock investments on the Singapore Exchange.

        t.    In or about February 2006, CHERNOV, Co-Conspirator Seven, posing as "Michael Woods," and certain other co-conspirators, planned to meet with C.F. and his wife in Moscow, Russia, regarding various investments proposed by CHERNOV. Although Co-Conspirator Seven did not ultimately attend the meeting, which otherwise went forward as planned, CHERNOV and others continued to refer to "Michael Woods" and the proposed business investments.

u.    On or about March 9, 2006, CHERNOV sent email correspondence to C.F., related to the sale of a villa in Thailand.  In subsequent correspondence, CHERNOV related that this villa belonged to "Michael Woods," an alias of Co-Conspirator Seven.

v.    From on or about March 21, 2006, through March 23, 2006, CHERNOV sent three emails to C.F. relating to the proposed visit to, and possible sale of, a villa in Thailand that CHERNOV and Co-Conspirator Seven had previously claimed belonged to "Michael Woods."   In these emails, CHERNOV referred to Co-Conspirator Seven as "Michael."

w.    In or about September 2006, Co-Conspirator Seven possessed an American Express card in the name of "Aleks Karanikolov."

All in violation of Title 18, United States Code, Section 1028(f).

## COUNT II

1.    Paragraphs 1 through 8 of Count One are incorporated by reference as if set forth fully herein.

2.    From in or about the Fall of 2000, and continuing up to in or about September, 2006, in the District of Utah and elsewhere,

### EGOR MICHAILOVICH CHERNOV,
a/k/a Vasko Svetlinov Aleksandrov,

the defendant herein, did knowingly and willfully conspire, combine, confederate and agree with other persons both known and unknown to the Grand Jury to commit offenses against the United State, to wit:

12

a.      falsely make, forge, counterfeit, mutilate, and alter passports and instruments purporting to be passports, with the intent that the same may be used, in violation of Title 18, United States Code, Sections 1543;

b.      willfully and knowingly furnish to another for use false and altered passports, in violation of Title 18, United States Code, Sections 1543; and

c.      knowingly possess documents prescribed by statute and regulation for entry into the United States, that is, Title 8, United States Code, Section 1181, 8 C.F.R. § 212.1, knowing such documents to be altered and falsely made and otherwise procured by fraud and unlawfully obtained, in violation of Title 18, United States Code, Section 1546.

3.      Paragraphs 10 through 11 of Count One are incorporated by reference as if set forth fully herein.

All in violation of Title 18, United States Code, Section 371.

A TRUE BILL:

_____
FOREPERSON OF THE GRAND JURY

BRETT L. TOLMAN
United States Attorney

JENNIFER SHASKY CALVERY
Trial Attorney, Criminal Division
U.S. Department of Justice

GREGORY C.J. LISA
Trial Attorney, Criminal Division
U.S. Department of Justice

13